RANDY S. GROSSMAN
Acting United States Attorney
JENNIFER E. MCCOLLOUGH
Assistant United States Attorney
Texas Bar No. 24099903
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: 619-546-8773

Jennifer.mccollough@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 11cr1495-AJB |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)** |
| v. | |
| LUIS EARNEST MORQUECHO (1), | |
| Defendant. | |

### Introduction

Defendant Luis Earnest Morquecho has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A), and order his immediate release based on the threat posed by the COVID-19 pandemic and arthritis in his spine, the loss of his eye, and inflammation of his heart. The Court should deny the motion for two reasons. First, no "extraordinary and compelling" reasons under § 3582(c)(1)(A) justify the extraordinary relief of a sentence reduction. Defendant refused a vaccine made available to him and none of Defendant's asserted medical conditions rise to the requisite level. Second, the 18 U.S.C. § 3553(a) factors counsel against release as Defendant has multiple disciplinary infractions, his underlying offense involved firearms, and drug trafficking is a danger in itself.

## Factual Background

On May 10, 2011, the Grand Jury returned a 6 Count Indictment charging Defendant in Counts 1,2,4 and 6 with (count 1) Conspiracy to Distribute Cocaine, (count 2) Conspiracy to Import/Transport Firearms, (count 4) Felon in Possession of a Firearm and (count 6) Money Laundering. On March 15, 2012, Defendant pleaded guilty to Counts 1 and 6.  On October 10, 2013, this Court sentenced him to 180 months on Count 1 and a concurrent 120 month sentence on Count 6, followed by terms of 5 and 3 years of Supervised Release respectively.   Defendant has served 120 months of that sentence. He is currently incarcerated at Lompoc and is scheduled to be released on May 4, 2024.

## I.    BOP's response to the COVID-19 pandemic.

The distribution of Pfizer and Moderna vaccines has reached more than 100 BOP institutions—representing every BOP facility within the United States. Numerous BOP facilities have already vaccinated hundreds of their inmates. Six facilities in particular—FCCs Beaumont, Butner, Coleman, Forrest City, Fort Dix, and Hazelton—have each fully vaccinated more than one thousand inmates. As of May 10, 2021, BOP reports that 171,611 total doses of the vaccine have been distributed within its facilities, and 167,230 doses have been administered.

Due in significant part to the effectiveness of BOP's national vaccination program, most BOP institutions now report zero or just a handful of active inmate infections. More vaccinations are coming as the rollout continues. On April 15, 2021, BOP Director Michael Carvajal testified to the Senate Judiciary Committee that every BOP employee has already been offered a vaccine, and he anticipates every inmate will have been given an opportunity to be vaccinated by mid-May.[1] As of April 5, 2021, approximately half of all BOP personnel have received at least one vaccine dose, and more than a third of all BOP inmates have received at least one dose of the vaccine.

---

[1] Statement of Michael D. Carvajal, Director of BOP, before the Committee on the Judiciary, United States Senate, available at: https://www.judiciary.senate.gov/imo/media/doc/BOP%20Director%20-%20%20Written%20Statement%202021-04-15%20SJC%20Hearing%20.pdf.

The United States will update the Court with information as it develops. Vaccination information with respect to individual BOP institutions is published in the BOP's Coronavirus Webpage at https://www.bop.gov/coronavirus/ (updated daily).

Meanwhile, BOP continues to undertake significant, ongoing, and evolving measures to protect the health of the inmates in its charge. On March 13, 2020, BOP began to modify its operations, in accordance with its COVID-19 Action Plan, to minimize the risk of COVID-19 transmission into and within its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to adapt to changing circumstances.

The current modified operations plan requires all inmates in every BOP institution to be secured in their assigned cells or quarters in order to contain the virus.[2] Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. While there will be exceptions for medical treatment and similar exigencies, this step aims to limit transmissions of the disease. All official staff travel has been cancelled, as has most training.

All staff and inmates have been and will continue to be issued face masks. Everyone is strongly encouraged to wear an appropriate face covering in public areas when social distancing cannot be achieved.

During the pandemic, enhanced health screening of staff is being performed at all BOP locations. Staff registering a temperature of 100.4 degrees or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer. Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

---

[2] Details and updates with respect to BOP's modified operations are available to the public on the BOP website on a regularly updated resource page at www.bop.gov/coronavirus/ (updated daily).

On August 5, 2020, BOP implemented Phase Nine of its COVID-19 Action Plan, which extended the previous guidance and instituted new measures to manage the pandemic.[3] When court trips are necessary, BOP will request the U.S. Marshals Service to keep inmates within their own housing or quarantine cohort and not mix them with inmates from other housing units or institutions. BOP will quarantine inmates if compliance with this request is not achieved. Inmates will be required to wear face coverings and perform hand hygiene before departure from and upon return to the institution.

Importantly, in Phase Nine, BOP began enhanced intake procedures of inmates. Under the new intake procedures, all newly admitted inmates—including inmates transferring from another BOP facility or an outside institution—are screened for COVID-19 on arrival using a symptom screen, temperature check, and approved viral PCR test. The test is performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab. Inmates who test positive or who are symptomatic will immediately be placed in medical isolation. Inmates who are asymptomatic and test negative will still be quarantined for a minimum of 14 days, and they will be tested again on the 14th day or after. They are not released into the general population until they complete the quarantine without developing symptoms *and* receive a second negative test from a commercial lab.

In addition to the enhanced intake screen, inmates must pass through a similarly rigorous process before transferring to another facility. Prior to transfer, these inmates are tested for COVID-19 with an approved test. Even if they test negative, they will be quarantined in units separate and apart from inmates going through intake or exposure quarantine. They must remain in "transfer" quarantine for a minimum of 14 days and pass a second approved COVID-19 test before they can depart the facility. As for inmates who recovered from COVID-19 and passed the requirements for release from medical isolation, such inmates must wait at least 90 days from the onset of symptoms or the date they tested positive, before they are deemed eligible for a transfer.

---

[3] Available at https://www.documentcloud.org/documents/7016444-BOP-Phase-9-COVID-Action-Plan.html.

Furthermore, to assist inmates who are the most vulnerable to COVID-19 and pose the least threat to the community, BOP has maximized its authority to designate inmates for home confinement. Since the national outbreak in March 2020, BOP has transferred a total of 25,244 inmates to home confinement.[4] The total BOP population, which was about 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades. By significantly decreasing the overall prison population, BOP has taken aggressive measures to maximize the opportunity for social distancing in prisons and to relieve the strain on its facilities.

Finally, BOP has begun additional testing of inmates who do not display symptoms. Consequently, its data will reflect an increase in the number of positive cases in many institutions. BOP's proactive approach to testing is aimed at giving individual prisons the information necessary to better manage the transmission of the virus and protect its inmates.

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to monitor the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate to incarcerate those sentenced or detained based on judicial orders.

No set of protocols is perfect. But BOP must balance its concern for the health of its inmates alongside other critical considerations. Despite COVID-19, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner. It must assess release plans, which are essential to ensuring that an inmate has a safe place to live and access to health care. And it must consider myriad other factors, including the supervision of inmates in a time when Probation has cut back on home visits.

//

//

---

[4] Available at https://www.bop.gov/coronavirus/faq.jsp.

## II.     Lompoc has taken rigorous measures to contain the virus.

Defendant is incarcerated at Lompoc USP. Gov. Ex. 1, Inmate Profile. Lompoc USP is part of a larger federal correctional complex known as Lompoc FCC, which includes a United States Penitentiary (Lompoc USP) and a Camp. Gov. Ex. 2, Cross Decl. at 2.[5]   In addition to the BOP-wide measures described above, Lompoc has taken additional specific measures to contain the virus as described further below. As of May 10, 2021, the number of inmates and staff currently infected there is <u>zero</u>. Furthermore, 214 inmates and 788 staff members in that institution have received and completed the full course of the COVID-19 vaccine. See BOP Coronavirus Website: www.bop.gov/coronavirus/ (updated daily).

Even before BOP implemented the latest initiatives described above, Lompoc FCC took additional specific measures to combat the COVID-19 outbreak that occurred in April and May 2020. In April, Lompoc FCC distributed surgical and cloth masks to every inmate, with replacements available upon request. Gov. Ex. 3, Engleman Decl. at 22.[6] Every inmate received disinfectant and paper towels to keep their housing area clean, hygiene items were issued weekly, and laundry exchange occurred weekly. Gov. Ex. 3 at 22. Lompoc also set up an off-campus health screening site through which all staff must successfully pass before being allowed into their work stations. Gov. Ex. 2 at 9. BOP staff were also required to work solely in one area (USP, FCI, or Camp), and all of their assignments were restricted to that area in order to prevent staff from going between facilities and possibly spreading the virus. Gov. Ex. 2 at 14. Similarly, inmates were cohorted by the structure of their facilities. Gov. Ex. 2 at 14. Within Lompoc FCI, which consists of dormitories on separate floors, inmates were cohorted within their assigned dormitory. Gov. Ex. 2 at 14.

In May, Lompoc announced that it would test 100% of the inmates at the FCI for COVID-19. Gov. Ex. 3 at 24. Lompoc acknowledged that mass testing may significantly increase the number of COVID-19 positive cases, but deemed it a necessary measure to

---

[5] Lawrence Cross is the Health Services Administrator at FCC Lompoc. His declaration was filed in the ongoing class action lawsuit in *Torres v. Milusic*, No. 20CV4450 (C.D. Cal.).

[6] James Engleman is the Associate Warden at FCC Lompoc. Likewise, his declaration was filed in the ongoing class action lawsuit in *Torres v. Milusic*, No. 20CV4450 (C.D. Cal.).

accomplish its mitigation goals. Gov. Ex. 3 at 24-25. After the majority of inmates at the FCI tested positive, 182 COVID-negative inmates were moved from the FCI into a quarantine unit at the USP in order to better protect them, reduce the FCI's population, and provide more space for social distancing. Gov. Ex. 2 at 15; Gov. Ex. 3 at 25. Lompoc also constructed and activated a Hospital Care Unit (HCU) that could provide medical treatment on-site. Gov. Ex. 3 at 25. Twenty contract workers were brought in to staff the HCU. Gov. Ex. 3 at 25. Lompoc also established a satellite HCU Pharmacy, created a HCU medical supply storage facility, and erected a hospital tent at the FCI. Gov. Ex. 3 at 26.

For the inmates who tested positive, Lompoc created an Isolation Unit capable of accommodating more than 200 inmates at once. Gov. Ex. 2 at 12. The Isolation Unit is comprised of cells that are walled-off on all sides except for the open-barred entryway. Gov. Ex. 2 at 12. If symptomatic inmates there did not need hospitalized care, they were treated by BOP medical staff until they recovered. Gov. Ex. 2 at 12. If their symptoms worsened, however, the medical staff gauged whether more advanced care was needed and whether to transfer them to the HCU or a hospital. Gov. Ex. 2 at 16. BOP medical staff conducts daily symptom and temperature checks of every inmate in the Isolation Unit. Gov. Ex. 2 at 12.

BOP also created a BLU-MED Negative Pressure Isolation Unit within the FCI. Gov. Ex. 2 at 17. It serves as a separate isolation unit for inmates with mild respiratory symptoms. Gov. Ex. 2 at 17. As of June 5, 2020, there were no inmates in the BLU-MED unit, although it remains available for use as needed. Gov. Ex. 2 at 17.

On September 8 and 9, 2020, an expert retained by the United States, Dr. Jeffrey Beard, conducted a detailed inspection of the facilities within Lompoc. Gov. Ex. 4 at 2, Government Response to Report of Dr. Homer Venters.[7] Dr. Beard concluded that although Lompoc had staff shortages when the first COVID-19 cases were identified, Lompoc "rapidly" obtained necessary medical staff and, in three weeks, constructed, staffed, and

---

[7] The United States filed this pleading, with the declaration of Dr. Jeffrey Beard appended, in the ongoing class action lawsuit in *Torres v. Milusic*, No. 20CV4450 (C.D. Cal.).

activated a "sophisticated" on-site HCU to respond to rising numbers of infected inmates. Gov. Ex. 4 at 56. In Dr. Beard's view, by adopting enhanced cleaning protocols, providing masks to staff and inmates, stocking up on PPE and cleaning material, establishing quarantine and isolation spaces, cohorting inmates into groups, increasing social distancing, coordinating with the local health authority, and mandating "several rounds" of universal testing—Lompoc "acted reasonably in dealing with the COVID-19 pandemic" and "contributed to ending the outbreak at FCC Lompoc." Govt. Ex. 4 at 59-60.

Equally important are the measures Lompoc has taken to significantly reduce its total inmate population. Govt. Ex. 4 at 61. Between March 26 and September 4, Lompoc released 552 inmates through a variety of means, including home confinement. Govt. Ex. 4 at 61. This reduction represented **25%** of the entire Lompoc inmate population as of September 2020. Govt. Ex. 4 at 61. The inmate reduction increased Lompoc's capacity for social distancing and improved the ability of staff to meet individual inmate needs. At the time of Dr. Beard's visit, the FCI was operating at less than 66% of its total inmate capacity (just 1001 inmates in a facility with a capacity for 1522). Govt. Ex. 4 at 32.

Finally, Dr. Beard's report provides necessary context for a competing report prepared by Dr. Homer Venters, who in some respects commended Lompoc and in some respects criticized it. Dr. Beard noted that many of Dr. Venters' conclusions were based on unverified statements by unidentified inmates, were not consistent with CDC guidelines, and were not consistent with underlying BOP records.[8] *See* Govt. Ex. 4 at 2-7, 45-46. For instance, although Dr. Venters reported that unidentified inmates told him they were not

---

[8] In the *Milusic* litigation, the United States sharply called into question Dr. Venters' reliability and credibility. Dr. Venters previously served as an expert in two other civil actions brought by federal inmates involving COVID-19 in correctional facilities. Govt. Ex. 4 at 7. In a case from the Eastern District of New York, U.S. District Judge Rachel Kovner issued a 62 page opinion in which she repeatedly determined that Dr. Venters' testimony and opinions were not reliable. Govt. Ex. 4 at 7-9. Like his opinions here, Dr. Venters' opinions were based on uncritical acceptance of unverified inmate statements, which were later refuted, and were inconsistent with prevailing CDC guidance. Govt. Ex. 4 at 7-9. The United States also identified troubling findings of scientific misconduct by Dr. Venters in previous research that was supported by the National Institute of Mental Health. Govt. Ex. 4 at 145. The misconduct involved, among other things, Dr. Venters submitting results that were "intentionally falsified[.]" Govt. Ex. 4 at 145.

receiving timely access to sick calls and chronic care, Dr. Beard found that the BOP records showed the opposite. Govt. Ex. 4 at 48-49. The records showed that with respect to requests for medical care, over 50% were responded to within 24 hours (usually the more serious cases), 25% were seen within 2 to 5 days, and the rest occurred within 6 to 14 days. Govt. Ex. 4 at 48. The records also "reflect ongoing chronic care services being provided." Govt. Ex. 4 at 49. As another example, Dr. Venters criticized Lompoc for not conducting daily screenings of inmates who have not contracted COVID-19. Govt. Ex. 4 at 46. Yet, this is contrary to the CDC's guidance, which does not recommend daily screenings. Govt. Ex. 4 and 46. Finally, Dr. Venters claimed that the four Lompoc inmates who died from COVID-19 were not adequately screened while they were in quarantine or isolation. Govt. Ex. 4 at 46-47. But Lompoc's records do not support Dr. Venters' assertion. Govt. Ex. 4 at 47. According to Dr. Beard, two of those inmates did not test positive until they were at the hospital, so they spent no time in isolation. Govt. Ex. 4 at 47. The third inmate was fully screened for body temperature and other symptoms during his 14 days in isolation. Govt. Ex. 4 at 47. The fourth inmate was screened daily from the day he displayed symptoms until the day he was transferred to the hospital, except for the day prior to his hospital transfer. Govt. Ex. 4 at 47. In sum, Dr. Beard's report undercut many of Dr. Venters' criticisms.

Notwithstanding the earlier outbreak in April and May 2020, Lompoc has taken rigorous measures to contain the virus and gain control over its spread. Although four inmates sadly passed away after the outbreak initially hit the facility, no deaths have occurred at Lompoc since June 1, 2020,[9] due to COVID-19.[10] As of May 10, 2021, the number of inmate infections at the FCI has fallen to zero. Similarly, at the FCI—where

---

[9] *See* BOP, Press Release on Inmate Death at FCI Lompoc, dated June 1, 2020, at: https://www.bop.gov/resources/news/pdfs/20200601_press_release_lom.pdf.

[10] Although an inmate died on December 15, 2020, his death does not appear to be COVID-related. But if it was COVID-related, it was related to the initial outbreak in April and May. This inmate first tested positive on May 4. Then, on May 20, he recovered and was released from medical isolation. Months later, on August 20, this inmate, who was 72 years old, was transported to a hospital for progressive paralysis. He passed away several months later. *See* BOP, Press Release on Inmate Death at FCI Lompoc, dated December 18, 2020, at: https://www.bop.gov/resources/news/pdfs/20201217_press_release_lom.pdf.

Defendant is housed—zero inmates are currently infected. *See* BOP Coronavirus Website: www.bop.gov/coronavirus/ (last visited May 10, 2021). As this Court has recognized, "BOP is doing an admirable job of containing the virus" at Lompoc. *United States v. Rocha*, No. 18CR4180-BAS (S.D. Cal. January 14, 2021) (Dkt. No. 79).

**III.  Defendant's conviction and request for sentence reduction.**

On May 10, 2011, a federal grand jury returned a six-count superseding Indictment charging Defendant and ten of his co-conspirators with conspiracy to distribute cocaine, conspiracy to transport firearms, felon in possession, and money laundering. On March 15, 2012, Defendant pled guilty to Count One, conspiracy to distribute five kilograms and more of cocaine, and Count Six, money laundering, of the superseding Indictment.

Defendant oversaw a cocaine distribution operation and was the source of supply for several codefendants also indicted in this case.  Evidence established that from October 2009 through at least March 2011, Defendant sold cocaine to a confidential informant ("CI") or undercover agent ("UA") on at least eight separate occasions and wiretap evidence indicated that Defendant often engaged, either directly or through his street-level distributors, in three to four narcotics transactions a day. An initial search warrant at Defendant's storage unit yielded one-half kilogram of cocaine and a large amount of ammunition.  In addition, during the course of the investigation, Defendant sold the CI and UA a number of Glock pistols, and several AR-15 assault rifles. On or about June 20, 2010, Defendant showed the CI and UA his Walther PPK .22 caliber pistol with a silencer - a weapon used to protect his illegitimate drug trade.  A search of Defendant's residence yielded a plethora of drugs, including 3 kilograms of cocaine (some of which was drying in the shower), hydrocodone, peyote pills, marijuana, MDMA, and oxycodone pills.  Notably, Defendant's toddler children lived in the same residence and were sometimes present during transactions between the Defendant and CI.  A subsequent search of Defendant's storage unit yielded six kilograms of cocaine and 18 firearms.  In all, 9.17 kilograms of cocaine was seized.  Defendant acknowledged responsibility to the distribution of 11 kilograms of cocaine.

With regard to money laundering, records checks and agent surveillance confirmed that Defendant had no legitimate employment going back to at least 2004. In September 2009, Defendant purchased a new, black Cadillac Escalade by paying approximately $30,500 in cash. The dealer recalled the bills being 10s, 20s, and 100s and coming from Ziplock freezer bags brought in via a suitcase.  In addition, when arrested, agents found $60,791 in cash secreted in a clothes hamper in Defendant's bathroom and also located a ledger keeping track of Defendant's assets, including both additional cash and cocaine. In addition to the Escalade, Defendant also had a BMW convertible parked in the garage. Agents also seized $279,500 in cash from Defendant's safe deposit box at a Wells Fargo bank.

Turning to criminal history, Defendant was convicted of a felony for cultivating marijuana and carrying a concealed weapon in 1994. Defendant had two additional felony drug-related offenses in 1996 and 2007, as well as several other traffic related offenses. PSR ¶¶ 45, 46, 49.

Defendant was sentenced on October 10, 2013.  ECF No. 299, 352.  The Court adopted the parties' guidelines calculations, arriving at an adjusted offense level of 37, with a guideline range of 262 to 327 months based on criminal history category three.  Sentencing Tr., ECF No. 352 at 4:20.  After argument from the parties and allocution by the Defendant, the Court considered Defendant's role in the operation and the sentences of his codefendants.  In arriving at a sentence four levels below the guidelines, the Court additionally considered Defendant's age, the potential disparity in sentencing, Defendant's history of drug use, the degenerative arthritis condition, and his criminal history.  Ultimately, the Court sentenced Defendant to 180 months followed by five years of supervised release. *Id.,* Tr. at 32-38.

Defendant a filed a motion to reduce sentence pursuant to Amendment 782 on April 18, 2017.  The Court denied that request as Defendant's 180 month sentenced remained below the adjusted guideline range. ECF No. 355.  Defendant sent a letter to the Court in December 2020, citing conditions at Lompoc under the pandemic and requesting an

11

attorney.  ECF No. 364.  Defendant then file a Motion to Reduce Sentence on February 22, 2021 which the Court denied as it lacked evidence of his medical conditions and that he had exhausted his administrative remedies.  The Court then granted Defendant's motion for appointment of counsel and supplemental briefing was filed on April 25, 2021.  ECF No. 374.  Defendant argues that arthritis in this spine, the loss of his eye, and inflammation of his heart constitute extraordinary and compelling reasons to reduce his sentence.

### Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in extraordinary circumstances, grant a motion to reduce a defendant's sentence. This motion may be brought by the BOP Director or by a defendant directly. Before a defendant may file a motion for sentence reduction, however, he must first request that the BOP file such a motion on his behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in section 3553(a)" if the Court finds that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

In the most recent Guidelines Manual, the Sentencing Commission issued a policy statement for reductions of sentences under § 3582(c)(1)(A). It provides that a court may reduce a sentence after considering the § 3553(a) factors if it finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the

safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an application note defining the criteria that qualify as "extraordinary and compelling." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Third, age may qualify if the defendant (1) is at least 65 years old; (2) is experiencing "a serious deterioration in physical or mental health because of the aging process"; and (3) has served at least 10 years or 75% of the sentence, whichever is less. U.S.S.G. § 1B1.13, cmt. n.1(B). Fourth, certain family circumstances may be extraordinary and compelling. U.S.S.G. § 1B1.13, cmt. n.1(C). Lastly, in a broad "catch-all" provision, the application note recognizes the possibility that the BOP Director could identify an extraordinary and compelling reason "other than, or in combination with, the reasons described" above. U.S.S.G. § 1B1.13, cmt. n.1(D).

### Discussion

This Court should deny Defendant's motion because he does not identify "extraordinary and compelling reasons" justifying the dramatic relief of a sentence reduction. Defendant does not have "a serious physical or medical condition" within the meaning of the Sentencing Commission's policy statement because he refused the vaccine when it was provided to him and his medical conditions do not rise to the level necessitating release.  Nor does Defendant present any reason that clears the high and "extraordinary" bar established by Congress in § 3582(c)(1)(A). Defendant also does not satisfy his burden to

13

show that release is warranted under the § 3553(a) factors, including the need to protect the public and satisfy other penological goals.[11] Defendant has sustained multiple disciplinary infractions while in custody, possessed a multitude of firearms during the investigation, and involved his minor children during drug transactions.

## I.     Defendant does not meet the threshold requirement of having "extraordinary and compelling reasons" required for relief under the statute.

Under 18 U.S.C. § 3582(c)(1)(A), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement defines "extraordinary and compelling" to include specific categories of medical conditions and other circumstances. U.S.S.G. § 1B1.13, cmt. n.1(A). Yet Defendant offers none of these circumstances in the motion.

### A.     After *Aruda*, this Court is not strictly bound by the Sentencing Commission's current policy statement, but it still serves as an important framework for the Court's exercise of discretion.

Whether the policy statement in U.S.S.G. § 1B1.13 is binding is "a difficult legal question" that has "sharply divided the courts." *United States v. Ruffin*, 978 F.3d 1000, 1006 (6th Cir. 2020). Following the lead of other circuits, the Ninth Circuit recently held that the policy statement is not binding. *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam). Under *Aruda*'s rationale, § 1B1.13 is technically not an "applicable policy statement[]" within the meaning of § 3582(c)(1)(A), because it was issued when only the BOP Director could file motions for compassionate release, before the First Step Act opened up the process to inmates. *Id.* at 800–802.

Importantly, *Aruda* did not express qualms about the *substance* of § 1B1.13's definition of "extraordinary and compelling." Nor did the Ninth Circuit question the Sentencing Commission's standing as the resident expert and the proper policymaker on this subject. See 28 U.S.C. § 994(t) (instructing Commission to "describe what should be

---

[11] Defendant met the statutory exhaustion requirement because he filed this motion after "the lapse of 30 days" from the date of his request to the warden. 18 U.S.C. § 3582(c)(1)(A). December 9, 2020, while the denial was dated December 22, 2021.

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); see also 28 U.S.C. § 994(o) ("In fulfilling its duties and exercising its powers, the Commission shall consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system"); 28 U.S.C. § 994(a)(2) (delegating to Commission power to create "policy statements regarding application of the guidelines or any other aspect of sentencing"). Sitting as "an expert body located within the Judicial Branch," the Commission is charged with the "intricate task of formulating" sentencing policy, *Mistretta v. United States*, 488 U.S. 361, 412 (1989), in order "to permit Federal courts to meet their responsibilities" with respect to sentencing. 28 U.S.C. § 995(a)(22).

Far from criticizing the wisdom of the existing policy, *Aruda*'s holding was instead wrought by bureaucratic happenstance, namely, the inability of the Sentencing Commission to update § 1B1.13 due to its current lack of a quorum. *Aruda*, 993 F.3d at 800 n.1. Since Congress "surely could not have known, and did not intend, that . . . the Sentencing Commission would fail altogether to issue a new policy statement," *United States v. McGee*, 992 F.3d 1035, 1050 n.5 (10th Cir. 2021), this Court should resist Defendant's invitation to "invent [its] own policies about compassionate release." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (Easterbrook, J.). That would be inconsistent with Congressional design. As the Ninth Circuit and its sister circuits have emphasized, § 1B1.13 continues to "inform a district court's discretion[.]" *Aruda*, 993 F.3d at 802. Because it remains "a working definition of 'extraordinary and compelling reasons[,]' a [court] who strikes off on a different path risks" abusing its discretion. *Gunn*, at 1180; see *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021).

Accordingly, the Court's analysis of whether an inmate's reasons are truly extraordinary and compelling should begin with the Sentencing Commission's current policy statement. In the vast majority of cases, it should end there, as well. At least four reasons support why the Court's discretion should hover close to § 1B1.13.

*First*, the history of § 1B1.13 shows that the Sentencing Commission drafted the current policy statement to maximize guidance on what "extraordinary and compelling" means. The Commission first promulgated § 1B1.13 in 2006, back when it was little more than a general proposition that the BOP Director could determine whether "a particular case warrants a reduction for extraordinary and compelling reasons[.]" U.S.S.G. § 1B1.13, cmt. n.1(A) (2006). After fleshing out those reasons in the 2007 amendments (while keeping intact the BOP Director's catch-all authority), see U.S.S.G. § 1B1.13, cmt. n.1(A) (2007), the Commission left the policy statement largely unchanged until 2016. That year, it "conducted an in-depth review" of compassionate release, in response to sharp criticism by the Office of Inspector General about BOP's "low approval rates" and inadequate "implementation of its compassionate release program." U.S.S.G. Appx. C, Amend. 799; see *United States v. Brooker*, 976 F.3d 228, 231–32 (2d Cir. 2020) (describing criticism). As part of its searching review, the Commission heard testimony from witnesses and experts about the need to broaden the criteria for eligibility, add guidance to the medical criteria, consider the "precipitous decline in health or circumstances that can occur after imprisonment," and generally remove hurdles that limit compassionate release for worthy inmates. U.S.S.G. Appx. C, Amend. 799. In the end, the Commission did precisely that, issuing a new policy that "broadens" the eligibility criteria and "encourages" the BOP to file motions using the new standard as its guide. *Id.* The new definition—which loosened the criteria for terminal illness, swept in more medical impairments, introduced a new age category, and made family reasons less restrictive—carried over to the current version of § 1B1.13 with virtually no change. See U.S.S.G. Appx. C, Amend. 813.

Section 1B1.13's twin goals of expanding compassionate release and crystalizing guidance for the decision-making authority means the policy statement is uniquely well-suited for use after the First Step Act, which similarly sought to "increase[e] the use and transparency of compassionate release." Pub. L. No. 115-391 § 603(b), December 21, 2018. Although the BOP did not file as many motions after 2016 as Congress hoped, see *United States v. Jones*, 980 F.3d 1098, 1104 (6th Cir. 2020) (describing frustration with BOP's

16

"conservative approach"), Congress did not believe the problem sprang from the Commission's eligibility standards. To the contrary, Congress—fully aware of the criteria in § 1B1.13—passed the First Step Act to change only *who* could file for compassionate release, not *what* made inmates eligible for it. See Pub. L. No. 115-391 § 603(b).

Notably, never in the history of § 1B1.13 has the Sentencing Commission regarded the length of an inmate's sentence as an "extraordinary and compelling reason" for compassionate release. See U.S.S.G. Appx. C, Amends. 683, 698, 746, 799, and 813. This is so even though Congress has legislated significant sentencing reductions before. For instance, in 2010, Congress passed the Fair Sentencing Act to profoundly reduce the penalties for dealing crack cocaine. Pub. L. No. 111-220 § 2, August 3, 2010; see *United States v. Kelley*, 962 F.3d 470, 472 (9th Cir. 2020) (describing significantly higher quantities of crack for mandatory penalties to apply). Yet § 1B1.13 has never referred to such changes (or sentence length in general) as qualifying criteria.[12] Viewed in proper historical context, therefore, the sentencing changes enacted by the First Step Act were not unusual or extraordinary, considering that in federal sentencing "the ordinary practice is to" withhold sentencing changes from defendants already sentenced. *Dorsey v. United States*, 567 U.S. 260, 280 (2012); see *United States v. Wills*, 991 F.3d 720, 2021 WL 1046489 at *2 (6th Cir. 2021) ("What the Supreme Court views as the 'ordinary practice' cannot also be an 'extraordinary and compelling reason' to deviate from that practice").

*Second*, abandoning § 1B1.13 risks reverting federal sentencing back to an era of indeterminate sentencing that was broadly repudiated by the Sentencing Reform Act in 1984. For nearly a century, rehabilitation was the primary objective of sentencing—to that end, district courts exercised "nearly unfettered discretion" to choose a sentence while parole officers had "almost absolute discretion" to decide when an offender should be released. *Mistretta*, 488 U.S. at 363–65. The system was ultimately regarded as a failure.

---

[12] Judge Charles Breyer, who currently serves as the acting chair of the Sentencing Commission, has written that courts may not reduce a sentence when the arguments merely "amount to a request that the Court resentence [the defendant] because his original sentence is, upon reflection, too severe." *United States v. Hussain*, No. 16CR462-CRB, 2020 WL 5910065 at *1 (N.D. Cal. October 6, 2020).

17

Not only did Congress "recognize[] that the efforts of the criminal justice system to achieve rehabilitation of offenders had failed," but the system also produced two "unjustified" and "shameful" consequences. *Id.* at 366 (quoting S. Rep. No. 98-225 at 38 and 65 (1983)). The first was "the great variation among sentences imposed by different judges upon similarly situated offenders." *Id.* The second was that nobody could be certain "as to the time the offender would spend in prison." *Id.* "Each was a serious impediment to an evenhanded and effective operation of the criminal justice system." *Id.* These outcomes were also viewed as contributing to growing prison unrest and unjustifiably lenient treatment of serious offenders during a period of rising crime. K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 30–31 (1998).

Against this backdrop, Congress passed the Sentencing Reform Act to abolish the parole system, create the Sentencing Commission, and generally "channel[] judges' discretion" in matters relating to sentencing. *Tapia v. United States*, 564 U.S. 319, 325 (2011). In so doing, Congress aspired to "develop a system of sentencing whereby the offender, the victim, and society all know the prison release date at the time of the initial sentencing by the court, subject to minor adjustments based on prison behavior called 'good time.'" S. Rep. No. 98-225 at 46 (1983). It sought nothing less than to create a "fair" system for both offenders and the public, to "retain the confidence of American society," and to ensure "an effective deterrent against crime." *Id.* at 49–50.

The Court's discretion should properly account for this history—not least because the Sentencing Reform Act enacted the modern compassionate release statute in 18 U.S.C. § 3582(c)(1)(A). Pub. L. No. 98-473, October 12, 1984. Compassionate release was not meant to preserve the function of parole in sentencing, nor was the First Step Act passed to resuscitate it.[13] Because § 1B1.13 continues to be an appropriate framework for determining compassionate release eligibility, the Court should "channel" its discretion through it.

---

[13] Unfortunately, not all courts agree. The United States is aware of one court that announced "its role in deciding compassionate release motions . . . is analogous to that traditionally exercised by a parole board." *United States v. Bass*, No. 97CR80235 (E.D.M.I. February 8, 2021) (Dkt. No. 1138) (Notice and Clarification). That court has granted 28 of the 29 of the compassionate release motions it decided on the

*Third*, while it is apparent that Congress in the First Step Act endeavored to release some deserving prisoners as a response to tough sentencing practices of past years,[14] compassionate release was not the solution it chose. Instead, Congress devised a calibrated and careful approach that was novel to the federal system. The Act directed the BOP to develop an intricate "risk and needs assessment system" that assigns prisoners to "evidence-based recidivism reduction programming" or other "productive activities," with the goal of lowering their recidivism rating or maintaining a good rating. P.L. No. 115-391 § 101; see 18 U.S.C. § 3632. Under this system, prisoners receive rewards for successful participation in these programs, the most prominent of which is the receipt of time credits that—on top of the application of good time credits under § 3624(b)—grant successful prisoners even earlier release from incarceration, to either some form of "prerelease custody" or to supervised release. P.L. No. 115-391 §§ 101–102; see 18 U.S.C. §§ 3632 and 3624.

The bill's main sponsors confirm that the new BOP system was a centerpiece of Congress' plan to reduce the U.S. prison population—but early release had to be earned. See 164 CONG. REC. S7744 (statement of Sen. Durbin) ("We spell out exactly what we are looking for: the most effective and efficient, evidence-based recidivism-reduction programs. . . . You are either going to do this in good faith, positively, without any violations of your responsibilities as a Federal prisoner—we will give you a chance for less time but no nonsense"); 164 CONG. REC. S7642 (statement of Sen. Cornyn) ("The goal of this bill is not to release broad swaths of criminals—in fact, it is just the opposite. This legislation allows prisons to help criminals transform their lives, if they are willing to take the steps

---

merits, including one filed by a 51 year old defendant serving concurrent mandatory life sentences for murdering two people and setting another victim on fire. *United States v. Bass*, Appeal No. 21-1094 (6th Cir. January 29, 2021) (Dkt. No. 5) (Emergency Motion for Stay). A different defendant released by that court has already been rearrested for attempting to murder a woman and her mother. *Id.* This cannot be what Congress envisioned for compassionate release when it passed the First Step Act. It certainly was not what Congress wanted when it enacted § 3582(c)(1)(A) in 1984—when one committee member responsible for the legislation hoped: "No longer will the victim of a crime, who heard the judge give a stiff sentence to his assailant, have the shock of meeting the offender on the street just a few years later because of his early release on parole. A victim will at least know at the time of sentencing how long an offender will have to serve." S. Rep. No. 98-225 at 794 (1983) (additional views of Sen. East).

[14] See 164 CONG. REC. S7737–7822 (December 18, 2018) and H10346–10366 (December 20, 2018).

and responsibility to do so"); see also 164 CONG. REC. S7744 (statement of Sen. Menendez) ("low-risk offenders will be able to earn credit by completing anti-recidivism programs that help better prepare them for life after prison"). As seen by some on the Senate floor, these reforms were only preliminary; another described it as "modest." See 164 CONG. REC. S7745 (statement of Sen. Blumenthal) (describing system as "another first step"); 64 CONG. REC. S7746 (statement of Sen. Cornyn) ("this is an important first step"); 64 CONG. REC. S7749 (statement of Sen. Leahy) (describing changes as "modest").

This too should inform the Court's discretion when deciding what qualifies for compassionate release. Congress understood that the public was concerned about high incarceration and long sentences. In response, it directed the BOP to grant early release to prisoners who successfully complete evidence-based programs and who can affirmatively show that they are unlikely to recidivate. In sharp contrast, Congress gave almost no attention to compassionate release in the debates leading up to passage of the First Step Act,[15] and the only change to 18 U.S.C. § 3582(c)(1)(A) was a procedural one allowing prisoners to file a motion. Because Congress implemented an intricate system within the BOP, prisoners should not circumvent that system by seeking compassionate release. In this context, arguments based primarily on sentence length and rehabilitation normally should not count as "extraordinary and compelling" reasons.

*Last*, hewing close to the existing policy statement is the soundest way to bridge the gap until the Guidelines Manual is updated. Without a doubt, resort to § 1B1.13 has proved entirely appropriate during the coronavirus pandemic. Applying its criteria, judges in this district have properly released scores of prisoners vulnerable to COVID-19 illness, while appropriately denying release to many others who are not as vulnerable. For a motion that does not assert any grounds covered by the policy statement, this Court retains "full

---

[15] In contrast with the robust discussion about BOP's new risk and needs assessment system, not two sentences were uttered about compassionate release, except to state the obvious, namely, that allowing prisoners to file motions would expand and improve the use of compassionate release. See 164 CONG. REC. S7774 (statement of Sen. Cardin) (bill "expands . . . and expedites" compassionate release); 164 CONG. REC. H10362 (statement of Rep. Nadler) (bill "improv[es] application of compassionate release").

discretion" to decide that it simply does not rise to such a "rare" occasion that it would meet the exacting bar established by Congress in § 3582(c)(1)(A). *Jones*, 980 F.3d at 1109; *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). After all, "extraordinary" means "*exceptional* to a very marked extent," and "compelling" means "to cause to do or occur by *overwhelming* pressure." Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphases added). Few cases actually meet this standard. By incorporating years of research, consultation, and policymaking expertise, the Sentencing Commission has developed criteria that guides the Court's application of this standard, consistent with Congress' directive to "provid[e] certainty and fairness in sentencing" and "reduc[e] unwarranted sentence disparities."[16] 28 U.S.C. § 994(f). If the policy statement does not cover the reason, it is unlikely "extraordinary and compelling."

### B.    Defendant does not have the "extraordinary and compelling reasons" required by 18 U.S.C. § 3582(c)(1)(A).

Courts routinely recognize that even despite the threat from COVID-19, "compassionate release is 'rare' and 'extraordinary;' [and] the current national emergency does not change this." *United States v. Arceo*, No. 9CR616, 2020 WL 2614873 at *2 (N.D. Cal. May 22, 2020); see *United States v. Smeltzer*, No. 18CR4562-JAH, 2020 WL 2797493 at *1 (S.D. Cal. May 29, 2020) ("18 U.S.C. § 3582(c)(1)(A) sets forth a rare exception to the general rule" that courts may not modify final sentence); *United States v. Grady*, No. 15CR204, 2020 WL 4274443 at *1 (E.D. Cal. July 24, 2020) (same).

Defendant therefore retains "the burden when making a motion for compassionate release to demonstrate that there are *truly* extraordinary and compelling reasons to change

---

[16] Exercising guided discretion is all the more necessary because there are indicators of rising violence in the Southern District of California. According to a report published by the San Diego Association of Governments about crime in 2020, homicides in the San Diego region increased by 35% (from 85 to 115), aggravated assaults increased by 8%, use of a firearm in aggravated assaults increased by 42%, and arson increased by 92%. Although residential burglaries decreased by 17%, nonresidential burglaries increased by 8%. On the other hand, there were decreases in other types of crime. The number of rapes reported decreased by 12%, robberies were down 13%, and property crime declined by 10%. See SANDAG C.J. Bulletin, 41 Years of Crime in the San Diego Region: 1980 Through 2020 (April 2021), available at: https://www.sandag.org/uploads/publicationid/publicationid_4765_28992.pdf.

and modify" the final sentence imposed by this Court. *United States v. Bouvier*, 473 F.Supp.3d 205, 206 (W.D.N.Y. 2020) (emphasis added). Because of "the high bar set by Congress and the Sentencing Commission for compassionate release," courts "routinely deny such claims" even during the current national emergency. *United States v. Porter*, No. 12CR643, 2020 WL 4332999 at *4 (D. Oregon July 27, 2020).

Defendant cannot meet the high bar of demonstrating he has extraordinary and compelling reasons. No evidence shows that Defendant has "a serious physical or medical condition" that "substantially diminishes" his ability to "provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Specifically, none of Defendant's asserted medical conditions rise to the level of severity required. Even with Hepatitis C, none of Defendant's medical conditions fall under those identified by the CDC as increasing a person's risk for severe illness from COVID-19.[17]   Neither spinal arthritis nor loss of vision are listed. Defendant therefore does not meet the "demanding standard for compassionate release." *United States v. Edison*, No. 12-225, 2020 WL 3871447 at *3 (D. Minn. July 9, 2020). As this Court and many others by now have concluded, "[c]hronic conditions . . . that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Pomo*, No. 17CR4360-WQH (S.D. Cal. December 14, 2020) (Dkt. 62); *United States v. Hayden*, No. 11CR393, 2020 WL 4674108 at *2 (D. Oregon August 11, 2020) (same); *United States v. Ballenger*, No. CR16-5535, 2020 WL 3488157 at *5 (W.D. Wash. June 26, 2020) (same); *United States v. Luck*, No. 12CR888, 2020 WL 3050762 at *2 (N.D. Cal. June 8, 2020) (same).

---

[17] As of May 10, 2021, the CDC has identified cancer, chronic kidney disease, chronic lung disease, dementia, diabetes, down syndrome, heart conditions (not including the bicuspid aortic valve), HIV, immunocompromise, liver disease, overweight, stroke, and substance use disorders as those that make it likely for an individual to get severely ill from COVID-19.  See CDC, People with Certain Medical Conditions:      https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html   (last visited May 10, 2021).

i.      Hepatitis C

Hepatitis C does not arise to "a serious physical or medical condition" such that it "substantially diminishes" Defendant's ability to "provide self-care within the environment of a correctional facility" and it is not a condition from which he "is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). First, although Hepatitis C is a liver infection caused by the hepatitis C virus, the CDC projects that "treatments can cure most people with hepatitis C in 8 to 12 weeks."[18] Second, the CDC's public guidance does not indicate that Hepatitis C is a risk factor for severe illness from COVID-19. According to the CDC: "Currently, we have no information about whether people with hepatitis B or hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19."[19]

Consequently, judges in this district have concluded that having Hepatitis C does not constitute an "extraordinary and compelling reason" to justify a reduction in sentence. *See United States v. Flores*, No. 19CR4340-CAB (S.D. Cal. September 1, 2020) (Docket No. 63) (42 year old inmate with Hepatitis C "does not have a terminal illness or a serious medical condition that substantially diminishes his ability to provide self-care within the environment of a correctional facility"); *United States v. Cosby,* No. 18CR4474-JAH, 2020 WL 3840567 at *4 (S.D. Cal. July 7, 2020) (denying release to 57 year old inmate because "the CDC reports that there is no information as to whether hepatitis B or C creates an increased risk to COVID-19"); *United States v. Kelm,* No. 19CR2993-JLS (S.D. Cal. October 1, 2020) (Dkt. No. 51) (58 year old inmate's Hepatitis C does not place him "at increased risk of severe illness"). Numerous other district courts are in agreement.[20]

---

[18] *See* CDC, Viral Hepatitis, available at: https://www.cdc.gov/hepatitis/hcv/index.htm (last visited May 10, 2021).
[19] *See* CDC, What to Know About Liver Disease and COVID-19, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last visited May 10, 2021).
[20] *See, e.g., United States v. Matulich,* No. 11CR327, 2020 WL 5229159 at *3 (D. Nev. September 1, 2020) ("the CDC currently has no information about whether Hepatitis C increases the risk of serious coronavirus complications"); *United States v. Duford,* No. 18CR42, 2020 WL 3542266 at *3 (D.N.H. June 30, 2020) (defendant's "hepatitis C does not place her in the high-risk category"); *United States v. Beyta,* No. 14CR29, 2020 WL 4593216 at *3 ("there is 'no information' as to whether people with Hepatitis C are at

In the present case, BOP's medical records show that the medical staff at Defendant's have appropriately treated Defendant's Hepatitis C and continue to do so. There is no evidence that Defendant has suffered any serious medical episodes as a result of the Hepatitis C virus. Nothing shows that Defendant's ability to provide self-care in his facility has been substantially diminished or compromised. Nothing shows that Defendant is suffering from a condition from which he is not expected to recover. Therefore, Defendant does not demonstrate an "extraordinary and compelling" reason here.

ii.      Bicuspid Aortic Valve

As for Defendant's bicuspid aortic valve, the only mention of this condition is with the recommendation that Defendant receive amoxicillin prior to any dental procedures.  He is not on medication for the condition.  There is no indication in his latest exam that he requires follow up for this condition.  There is no indication Defendant suffers from hypertension anywhere in his medical record.[21]  In fact, his record is replete with indications that his cardiovascular system is "within normal limits."[22]  Thus, Defendant does not demonstrate an "extraordinary and compelling" reason here either.

C.      Defendant was offered a vaccine and refused.

Defendant was offered the Moderna vaccine on April 9, 2021, and he refused it.[23] Gov. Ex. 5.  That similarly precludes eligibility for compassionate release. *See, e.g., United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (Teilborg, J.) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases).

---

increased risk of serious illness from contracting COVID-19"); *United States v. Son Nguyen,* No. 15CR120, 2020 WL 5038765 at *2 (W.D. Wa. August 25, 2020) (HIV and Hepatitis C not extraordinary).

[21] While the Government is filing small portions of Defendant's record with this filing, the entire record will be filed under seal for the Court's convenience.

[22] This is true during exams conducted on February 17, 2021, January 1, 2021, October 5, 2020, March 16, 2020, February 20, 2020, etc.

[23] Of note, this is not the first time Defendant has refused vaccines.  He additionally refused the influenza vaccine in October 2019 and September 2020.

The CDC has unequivocally instructed the public that "[a]ll COVID-19 vaccines currently available in the United States have been shown to be safe and effective at preventing COVID-19." See CDC, Benefits of Getting a COVID-19 Vaccine, available at: www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (updated April 12, 2021). What is more, inmates who are vaccinated "may also protect people around" them, passing the aggregate benefits of vaccine protection to the overall prison population. *Id.* Even in the unlikely case that a person gets COVID-19 after getting vaccinated, the scientific evidence to date shows that "[a]ll authorized COVID-19 vaccines demonstrated high efficacy" against both severe illness and death. See CDC, Science Brief: Background Rationale and Evidence for Public Health Recommendations for Fully Vaccinated People, available at: www.cdc.gov/coronavirus/2019-ncov/more/fully-vaccinated-people.html (updated April 2, 2021).

A significant study published by the CDC on March 29, 2021, measured the effectiveness of the Pfizer and Moderna vaccines for nearly 4,000 health care workers, first responders, and essential workers, under real-world conditions between December 2020 and March 2021. The study shows that those who were fully vaccinated were 90% less likely to get infected with COVID-19. As importantly, for those who were only partially vaccinated (meaning they only received the initial dose of the Pfizer or Moderna vaccine), the risk of infection was still reduced by 80%. Moreover, this study provided more information than the Phase 3 clinical trials. Whereas the Phase 3 clinical trials measured overall vaccine efficacy against COVID-19 symptoms, this study measured vaccine effectiveness against COVID-19 infection *itself*, encompassing infections that did not result in any symptoms whatsoever. See CDC, Interim Estimates of Vaccine Effectiveness, available at: www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm?s_cid=mm7013e3_w (dated March 29, 2021 and updated April 2, 2021); see also CDC, CDC Real-World Study Confirm Protective Benefits of mRNA COVID-19 Vaccines, available at: www.cdc.gov/media/releases/2021/p0329-COVID-19-Vaccines.html (dated March 29, 2021).

Then on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants from its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with underlying conditions, and during a period through March 13, 2021, when virus variants were already in circulation. Significantly, Pfizer further found that the vaccine was *100% effective* against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA. BusinessWire, Pfizer and BioNTech Confirm High Efficacy and No Serious Safety Concerns, available at: www.businesswire.com/news/home/20210401005365/en/ (dated April 1, 2021).

As for the Janssen (Johnson & Johnson) vaccine, the FDA tested it among 40,000 participants in a double-blind trial and measured the incidence of COVID-19 infection 28 days after vaccination. Researchers found that the Janssen vaccine was approximately 66% effective in preventing moderate to severe COVID-19 symptoms, and approximately 85% effective in preventing severe COVID-19. Importantly, *none* of the 40,000 vaccinated participants died of COVID-19. FDA Decision Memorandum, available at: www.fda.gov/media/146338/download (dated February 4, 2021).[24]

Accordingly, other judges in this district recognize "the growing scientific research that vaccinations are largely successful at warding off the coronavirus." *United States v. Wang*, No. 19CR1895-BAS (S.D. Cal. April 6, 2020) (Dkt. No. 111). This Court therefore "agrees with other district courts that Defendant's 'vaccination significantly mitigates the risk that [he] will contract COVID-19,' much less become seriously ill." *United States v. Del Rosario Martinez*, __ F. Supp.3d __, No. 19CR5218-MMA, 2021 WL 956158 (S.D.

---

[24] On April 23, 2021, the CDC lifted its pause in the administration of the Janssen vaccine after concluding that the benefits of the vaccine far outweighed the risks from a rare blood clot that occurred in six cases among the millions of people who had received the vaccine. Lena Sun and Carolyn Johnson, Federal agencies lift temporary pause, The Washington Post, April 23, 2021, available at: https://www.washingtonpost.com/health/2021/04/23/johnson-and-johnson-vaccine-blood-clots/.

Cal. March 10, 2021) (Dkt. No. 41) (collecting cases). In fact, this Court has held that receiving even a partial dose of the vaccine eliminates the conditions that would otherwise qualify an inmate for compassionate release. In *United States v. Cervantes*, 17CR1257-JLS (S.D. Cal. April 16, 2021) (Dkt. No. 98), this Court held that a defendant with "serious medical concerns" could not establish "extraordinary and compelling reasons" for a sentence reduction, because after receiving at least one dose of the Moderna vaccine (and in the context of the increasing availability of vaccines within the BOP), "the institutional risk factor associated with the virus' transmission is not nearly as significant as it was earlier in the pandemic."

Defendant is fortunate to have access to a vaccine that public health officials assure will significantly mitigate the risk of serious illness from COVID-19. This Court has concluded that for inmates with underlying health conditions, their "chances of reinfection or relapse have been largely dissipated by [the] vaccination." *United States v. Henderson*, No. 14CR307-BAS (S.D. Cal. January 27, 2021) (Dkt. No. 74) (morbidly obese inmate with asthma cannot show "extraordinary and compelling" reasons after being vaccinated). Like many courts around the country, this Court has held that "[a]lthough Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19." *United States v. Grummer*, No. 8CR4402-DMS (S.D. Cal. February 16, 2021) (Dkt. No. 132) (denying compassionate release to 55 year old inmate with chronic heart disease, hypertension, and asthma); see *United States v. Smith*, No. 17CR20753, 2021 WL 364636 at *2 (E.D. Mich. February 3, 2021) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling'").

It is possible that the scientific consensus may shift if vaccine-resistant variants emerge or the vaccines prove less effective than studies to date suggest. If those possibilities materialize, Defendant can file another motion for compassionate release. At this time, however, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe

disease from COVID-19. As inmates are vaccinated throughout BOP, this unprecedented period, in which the threat of the virus sometimes gives rise to "extraordinary and compelling" circumstances, should come to an end.

To counter the broad scientific consensus about the effectiveness of COVID-19 vaccines, many motions for compassionate release now resort to sowing doubt, heightening skepticism, and shaking confidence in the authorized vaccines. Defendants in this district (as well as around the country) have opportunistically latched onto declarations submitted by medical professionals such as Dr. Tara Vijayan, who are keen to highlight what we *don't* know about the vaccines in contradistinction to what we do know. Quite notably, it is clear from Dr. Vijayan's declaration that it espouses a particular social view, and for Dr. Vijayan, nothing less than the "decarceration" of prisons will suffice.

This Court has wisely refused to give credence to such efforts to spin the scientific evidence. In *Del Rosario Martinez*, this Court forcefully repudiated Dr. Vijayan's declaration by reasoning: "with all due respect to Dr. Vijayan's expertise and experience, the Court declines to contribute in any fashion to public skepticism regarding the safety and efficacy of the available COVID-19 vaccines or to second-guess the Food and Drug Administration's findings and decision to issue Emergency Use Authorizations for COVID-19 vaccines 'for which there is adequate manufacturing information to ensure its quality and consistency.'" __ F.Supp.3d __, No. 19CR5218-MMA, 2021 WL 956158 at *3 n.10 (quoting FDA, The Path for a COVID-19 Vaccine from Research to Emergency Use Authorization, available at: www.FDA.gov/COVID19vaccines#FDAVaccineFacts).

In contrast with the speculation-driven opinions offered by Dr. Vijayan, this Court braced its analysis with widely accepted scientific data conducted not just in the United States, but abroad in the United Kingdom and Israel. *Del Rosario Martinez*, __ F.Supp.3d __, No. 19CR5218-MMA, 2021 WL 956158 at *3 n.10 (citing CDC, Science Brief: Background Rationale and Evidence for Public Health Recommendations for Fully Vaccinated People, available at: www.cdc.gov/coronavirus/2019-ncov/more/fully-vaccinated-people.html). Today, the data is even more robust than when the Court in *Del*

*Rosario Martinez* analyzed it in March. Specifically, the data now shows that among elderly adults in the United Kingdom who are 80 years old or older—encompassing those with multiple underlying conditions—the Pfizer vaccine is 89% effective against any symptomatic disease. See CDC, Science Brief: Background Rationale and Evidence for Public Health Recommendations for Fully Vaccinated People, available at: www.cdc.gov/coronavirus/2019-ncov/more/fully-vaccinated-people.html (updated April 2, 2021). As remarkably, within the adult population in Israel, the Pfizer vaccine was shown to be more than 97% effective in preventing symptomatic disease, severe disease, and death. *Id.* And in Israel, the few who got COVID-19 after being vaccinated nevertheless had a four-fold lower viral load than unvaccinated people, indicating reduced transmissibility. *Id.*

Thus, Defendant's refusal to accept the COVID-19 vaccine should not open the door for compassionate release. Instead, it should close it, because he cannot show that circumstances "substantially diminish the ability of the defendant to provide self-care[.]" U.S.S.G. § 1B1.13, cmt. 1(A)(ii). It is precisely due to his refusal to provide self-care that drives, and justifies the denial of, the instant motion. Defendant "cannot reasonably expect that prolonging his risk by declining a vaccination will be rewarded with a sentence reduction." *United States v. Lohmeier*, No. 12CR1005, 2021 WL 365773 at *2 (N.D. Ill. February 3, 2021). By "refus[ing] the Pfizer COVID-19 vaccine," Defendant shows that there are no "extraordinary and compelling circumstances[.]" *United States v. King*, No. 16CR478, 2021 WL 73622 at *2 (S.D.N.Y. February 24, 2021). After all, "refusal to take preventative measures undermines [the] assertion that extraordinary and compelling reasons exist to warrant his release from prison." *United States v. McBride*, No. 19CR7, 2021 WL 354129 at *2 (W.D.N.C. February 2, 2021); see *United States v. Baeza-Vargas*, No. 10CR448, 2021 WL 1250349 at *3 (D. Ariz. April 5, 2021) (courts "around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances" [collecting cases]).

As one district court persuasively observed:

> A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination. Allowing federal prisoners to qualify for compassionate release by declining to receive a COVID-19 vaccine, without justification, would discourage prisoners from becoming vaccinated. The court is exceedingly hesitant to provide prisoners an incentive to *increase* their risk of contracting COVID-19 and developing severe symptoms. Such a result would be profoundly counter-productive and would militate against the ameliorative purposes of compassionate release. Denial of Defendant's request for release is warranted on this basis alone.

*United States v. Austin*, No. 15-20609, 2021 WL 1137987 at *2 (E.D. Mich. March 25, 2021)

Judges from this district have consistently held in cases like *Del Rosario Martinez*, *Wang*, *Cervantez*, *Henderson*, and *Grummer*, that defendants who have received the COVID-19 vaccine cannot demonstrate an "extraordinary and compelling" reason for compassionate release. This Court should do the same when defendants recklessly refuse to protect themselves and others by declining a readily available vaccine.

D.     Defendant's medical conditions are controlled and well-managed.

A review of Defendant's medical records show his conditions and well-managed and well-controlled by BOP staff.  His latest medical note – outside asymptomatic tests for the COVID-19 virus – indicates his pulmonary, cardiovascular, abdomen, and musculoskeletal systems are within normal limits.  Ex.6, Medical note dated February 16, 2021.  The assessment indicates he has generalized anxiety order, constipation, esophageal reflux, and hemorrhoids and that he is receiving medications for acne, esophageal reflux, hepatitis C, and atopic dermatitis.

E.     Defendant's disciplinary history includes misuse of medication.

Defendant has had seven disciplinary infractions, the most recent on September 28, 2020 when Defendant possessed contraband.  Ex. 7, Defendant's Disciplinary Record. More concerning is Defendant's multiple infractions for non-compliance with his medication.  He has three of these violations– on January 11, 2018, January 2, 2018, and March 1, 2014.  Defendant also has infractions for possessing intoxicants, drugs, and alcohol, indicating he is not willing to comply with orders or instructions.

In sum, because Defendant does not meet the heavy burden of demonstrating "extraordinary and compelling reasons," the Court should deny the motion on that basis alone.

## II.   The factors under 18 U.S.C. § 3553(a) do not support release.

In addition, this Court must consider the 18 U.S.C. § 3553(a) factors in deciding whether a reduction in sentence is warranted. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). They also counsel against release.

Defendants involvement in the drug trade dates back to his first conviction in 1994. And this was his THIRD conviction for drug trafficking.  Notably, the underlying conduct in this case not only involved in drug distribution and money laundering, but the sale of firearms.  Moreover, agents found 18 firearms of various types of caliber in his storage unit. Defendant possessed a plethora of drugs in his residence and trafficked drugs in the presence of his then two and three-year-old children.  This course of conduct has only continued while in custody with multiple disciplinary infractions.   In sum, Defendant has not demonstrated he will comply with instructions or court orders.

Defendant's repeated involvement in drug trafficking presents a true risk that he will continue his past conduct if released. This is a danger to the community. The concept of danger in the statute is not limited to a threat of violence. As courts have consistently recognized, the proliferation of dangerous addictive narcotics is a significant public and societal harm. Indeed, as one court noted, drug trafficking, even "without more, causes serious harm to society. A drug trafficker is, by definition, a danger to the community." *United States v. Ailemen,* 165 F.R.D. 571, 596 (N.D. Cal. 1996). That is because "[d]rug trafficking also creates additional real dangers—through crimes committed by addicts seeking to support their habits, through plain human suffering, and because people engaged in the sale of illegal substances sometimes commit or direct violent crimes in furtherance of their enterprises." *Id.* This Court shares this view of drug trafficking. *See United States v. Lopez-Ontiveros*, No. 15CR575-GPC (S.D. Cal. October 6, 2020) (Dkt. 426) (Defendant

"endangered the public by placing over 45 kilograms of methamphetamine into the community"); *United States v. Banuelos*, No. 16CR1008-BAS (S.D. Cal. October 23, 2020) (Dkt. No. 162) (denying compassionate release based in part on "the need to protect the public from further crimes" of repeat drug distributor); *United States v. Vignoni*, No. 17CR1352-W (S.D. Cal. January 29, 2021) (Dkt. No. 57) ("Drug traffickers, especially repeat drug traffickers, present danger to the public"); *see also United States v. Manso-Portes*, 838 F.2d 889, 890 (7th Cir. 1987) ("continued sale of drugs is itself dangerous; the statute does not limit 'danger to . . . the community' to the threat of violence"); *United States v. Strong,* 775 F.2d 504, 506 (3d Cir. 1985) ("The statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community").

Exacerbating Defendant's history of drug crimes is his own history of drug addiction. Although Defendant's progress towards sobriety in prison should not be discounted—and indeed should be commended—the Court should not overlook Defendant's clear difficulties with sobriety when in the community. This Court has recognized that there are serious risks associated with inmates sharing Defendant's same characteristics. And this Court has denied compassionate release for such inmates despite the presence of "extraordinary and compelling" medical reasons making them more vulnerable to COVID-19. Judge Lorenz's analysis applies here with force:

> Defendant is to be commended for his sobriety and the efforts he has made to pursue education and therapeutic care while incarcerated. However, it has been difficult or impossible for Defendant to continue sobriety in the past when he has been in the community, and he has fallen back into criminal habits repeatedly as evidenced by his extensive criminal history. Defendant was convicted in the present case for distributing methamphetamine, a dangerous controlled substance. That crime put the community at risk and it is not the first time he has been convicted of a crime related to methamphetamine. Defendant himself has struggled with addiction to methamphetamine, indicating its destructiveness. In addition, Defendant was on probation when he was arrested in the present case. The Court finds that Defendant's drug addiction, criminal history, and inability to successfully complete terms of parole or probation indicate that, despite his new sobriety in custody, he would

be a danger to others if the Court was to grant his motion for compassionate release. *See* [18] U.S.C. § 1342(g).

*United States v. Legaspi,* No. 18CR1671-2-L (S.D. Cal. September 22, 2020) (Dkt. 66) (denying compassionate release to 49 year old Lompoc inmate with Type 2 diabetes, obesity, and hypertension, and who was hospitalized with COVID-19 in May).

The Nation's unprecedented state of economic and social disruption is all the more reason why it would be imprudent to release Defendant now. The facts on the ground are unfortunate but unavoidable. During the pandemic unemployment reached "historic heights"; many households in the United States are feeling "the economic pain" and facing a "looming eviction crisis[.]"[25] The pandemic is believed to be "increas[ing] illicit drug use" and "driving drug overdose trends[.]"[26] Sadly, these effects can be seen here in the Southern District of California, where "[o]verdose deaths have spiked in San Diego County this year"—with 675 deaths confirmed through October 2020—"as an already worsening drug epidemic collides with the coronavirus pandemic."[27]

In addition, violent crime is "surg[ing] across the U.S."[28] Law enforcement officials of major U.S. cities believe the crime wave is directly attributable to the release of criminals "in an effort to blunt the spread of COVID-19 [who] are not being monitored as closely as they should be."[29] Gun violence and homicides have spiked dramatically in big cities such as Chicago, New York, and Philadelphia—and also in smaller cities such as Grand Rapids

---

[25] Brookings Institution, "COVID-19 job and income loss leading to more hunger and financial hardship," dated July 13, 2020, available at: https://www.brookings.edu/blog/up-front/2020/07/13/covid-19-job-and-income-loss-leading-to-more-hunger-and-financial-hardship/.

[26] American Association for Clinical Chemistry, "When a Substance Abuse Crisis and Pandemic Intersect," dated August 20, 2020, available at: https://www.aacc.org/cln/cln-stat/2020/august/20/when-a-substance-abuse-crisis-and-pandemic-intersect.

[27] The San Diego Union Tribute, "Drug deaths were already climbing at the beginning of 2020. Then the pandemic hit," dated November 28, 2020, available at: https://www.sandiegouniontribune.com/news/health/story/2020-11-28/overdoses-rise-pandemic-addiction-awareness-initiative.

[28] ABC News, "As shootings surge across US, police see COVID's crippling of justice system enabling crime," dated July 6, 2020, available at: https://abcnews.go.com/US/shootings-surge-us-police-covids-crippling-justice-system/story?id=71637222.

[29] *Id.*

33

and Milwaukee.[30] In Chicago, for example, domestic-related homicides in 2020 increased by a stunning 60%; while total homicides in that city skyrocketed to 739 in 2020 compared with 475 in 2019.[31] And for reasons related to that as well as other forces, law enforcement and probation resources are strained.

Releasing Defendant—with his repeated involvement with drug distribution and history of drug abuse—exposes both him and the community to the immense pressures of the moment. Defendant would be released into a climate where legitimate jobs are ever more competitive and Americans are experiencing greater economic, social, psychological, and medical strain. It will be harder for probation and law enforcement authorities—who are dealing with higher caseloads and their own internal pressures during COVID-19—to adequately monitor, supervise, and respond to him. And the public will be left to bear the dangers of Defendant's release while simultaneously contending with numerous crises.

For all these reasons, the Court should find that Defendant presents a danger to the community and deny his motion for compassionate release.

### Conclusion

For these reasons, this Court should deny Defendant's motion requesting compassionate release.

DATED: May 10, 2021                     Respectfully submitted,

                                        RANDY S. GROSSMAN
                                        Acting United States Attorney

                                        */s/ Jennifer E. McCollough*
                                        Jennifer E. McCollough
                                        Assistant U.S. Attorney

---

[30] AP, "As COVID-19 ravages US, shootings, killings are also up," dated December 28, 2020, available at: https://apnews.com/article/shootings-chicago-philadelphia-michigan-violence-00f58bd0043aab2861a073b337662631.

[31] *Id.*

34